## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **RALPH VINCENT KIDD, III** | * | **CIVIL ACTION** |
| | * | |
| **VERSUS** | * | **NO. 10-3361** |
| | * | |
| **SYMBION, INC.** | * | **SECTION "L"(3)** |

### ORDER & REASONS

Before the Court is defendants Symbion, Inc. ("Symbion"), ASC of Hammond, Inc. ("ACS"), and Surgery Center of Hammond, LLC's ("SCH") (collectively "Defendants") Motion for Summary Judgment (R. Doc. 38). For the following reasons, IT IS ORDERED that this Motion is GRANTED IN PART and DENIED IN PART.

## I.   BACKGROUND

This case arises out of investment in a medical clinic and alleged misrepresentation regarding this investment, mismanagement of the clinic, and personal injuries sustained while working at the clinic. In 1996, Plaintiff, Ralph Vincent Kidd, III, a board-certified urologist, along with other physicians in the Hammond, Louisiana area formed a business entity for the purpose of building an ambulatory surgery center which was later named St. Luke's Surgery Center ("St. Luke's"). Sometime around July 2001, St. Luke's was purchased by defendant SCH, and pursuant to the Operating Agreement of SCH, defendant ASC was named the Managing Member of SCH. At this time ASC was a subsidiary of Universal Health Services, Inc. In August 2004, a subsidiary of defendant Symbion acquired the capital stock of ASC from Universal. Symbion owns and operates a national network of short stay surgery facilities in 26 states.

1

In 2007, SCH offered membership interests to physician investors, including the Plaintiff.  A written private placement memorandum ("PPM") was provided to Plaintiff, setting forth the terms of the investment.  The PPM characterizes the corporate structure of St. Luke's as follows: St. Luke's is owned by the LLC SCH, the Managing Member of which is ACS, and ACS is a wholly owned subsidiary of ARC Financial Services, Corp., which is a wholly owned subsidiary of Symbion Ambulatory Resources Centers, Inc., which is a wholly owned subsidiary of defendant Symbion.  According to Plaintiff, he was recruited by Shannon Charles, an agent of defendant Symbion, to invest in SCH in March 2007.  Plaintiff claims Ms. Charles made verbal representations to him regarding investing in SCH which were contrary or inconsistent with the PPM, and which he relied upon in deciding to invest in SCH.  During 2007, Plaintiff executed written Subscription Agreements, investing six units for a total of $15,000.  During the time he was an investor in SCH, Plaintiff received distributions from SCH totaling $10,200.

Plaintiff worked at St. Luke's between May 2007 and April 2010.  He performed fluoroscopic cystoscopy procedures, an x-ray procedure which exposed Plaintiff to radiation. Plaintiff wore a lead apron and radiation detection device known as a TLD while performing these procedures.

In April 2010, Plaintiff and other physicians offered to purchase all of ASC's membership interest in SCH.  ASC, however, turned down this offer.  Then in June 2010, SCH redeemed the investments of Plaintiff and eight other investors, claiming these investors no longer met the criteria for physician investors under the terms of the Operating Agreement.

On September 17, 2010, Plaintiff filed a Petition for Damages against Symbion and ASC in the 21st Judicial District Court, Parish of Tangipahoa, State of Louisiana.  *See* (R. Doc. 1).  Therein, Plaintiff alleges he invested in SCH based upon the verbal representations made by Ms. Charles on behalf of Symbion, and that these representations have not proven true and are contrary to written documents he executed when investing in SCH.  He further alleges Symbion has been controlling ASC and SCH, the latter of which he describes as "dummy companies," again contrary to the representations made by Ms. Charles and the documents he executed when investing in SCH.  According to Plaintiff, Symbion and ASC have been non-compliant with the St. Luke's Operating Agreement, grossly mismanaged St. Luke's, breached fiduciary duties to Plaintiff and other physician investors, violated healthcare laws and regulations, violated state law securities regulations, and committed torts, all of which harmed his investment in SCH.  Additionally, Plaintiff claims that during the time he worked at St. Luke's, he was exposed to injurious radiation and x-ray exposure as a result of these defendants' failure to fulfill their promise to purchase a new x-ray table.  This, according to Plaintiff, caused him to leave St. Luke's and work at North Oaks, resulting in a loss of substantial income.

On October 5, 2010, Symbion and ASC filed a Notice of Removal in this Court, citing diversity jurisdiction.  *See id.*  They then filed an Answer, denying Plaintiff's allegations, as well as any fault, and claiming Plaintiff assumed the risk of his investment.  (R. Doc. 12).  These defendants also raise a number of affirmative defenses.  *Id.*

Plaintiff filed an Amended Complaint on March 17, 2011, adding SCH as an additional defendant.  (R. Doc. 25).  The Defendants all filed an Answer to this Complaint, further denying liability and raising a number of affirmative defenses.  (R. Doc. 28).

On July 22, 2011, the Defendants filed the present Motion for Summary Judgment, seeking dismissal of all claims filed against them.  (R. Doc. 38).  They also filed two *Daubert* motions on this same date.  *See* (R. Docs. 39, 40).  The Court scheduled all three motions for hearing with oral argument on August 31, 2011.  *See* (R. Doc. 61).  The Court ruled from the bench, denying the *Daubert* motions, but taking under submission the Motion for Summary Judgment.  *See id.*  The present Order & Reasons resolves this latter Motion.

## II.      DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A.          Defendants' Motion

Defendants filed a Motion for Summary Judgment with respect to all claims brought by Plaintiff.  (R. Doc. 38).  At the outset, Defendants organize Plaintiff's claims into the following categories: (1) violations of the Louisiana Securities Act, (2) bodily injury arising out of Defendants' negligence, and (3) breach of contract and breach of fiduciary duty.

Defendants argue that summary judgment on all claims against Symbion is appropriate.  Defendants claim the PPM apprised Plaintiff of the corporate relationship between the Defendants, notably that Symbion's only connection to SCH is its status as the indirect shareholder of the Managing Member, ASC.  Defendants argue there exists no basis for piercing the corporate veil and holding Symbion liable for the claims asserted by Plaintiff against ASC and SCH.  Additionally, Defendants claim there is no contractual or fiduciary relationship between Plaintiff and Symbion, nor are there any direct claims against Symbion.  They further claim that any representations made in connection with the sale of units in SCH were done by SCH and ASC, not Symbion.

Defendants next argue that summary judgment on the claims against ASC and SCH is

4

appropriate, applying three arguments to both parties.  First, Defendants argue that Plaintiff's claims against ASC and SCH arising under the Louisiana Securities Act are barred by the two-year statute of limitations.  They note Plaintiff admits his last purchase of membership units took place in July 2007, but the present litigation was not filed until September 17, 2010.

Second, Defendants argue that Plaintiff's breach of contract claims against ASC and SCH are without merit.  They claim that because Plaintiff is not a party to the Management Agreement, a contract between SCH and ASC, he has no standing to sue for any alleged breach.  According to the Defendants, the Management Agreement does not grant individual members of the LLC such as Plaintiff the right to sue, except through a derivative action, but note that such action would be brought for the benefit of the entire LLC, not Plaintiff individually.  Additionally, Defendants claim that ASC and SCH cannot be held liable for breach of the Operating Agreement or breach of their fiduciary duties because the actions alleged by Plaintiff to be breaches are actually these defendant's express rights and obligations pursuant to the Operating Agreement, and the alleged breaches amount to good faith business decisions for which these defendants have immunity.

Third, Defendants argue that ASC and SCH are entitled to summary judgment on Plaintiff's personal injury claims.  They claim that Plaintiff cannot prove damages because he has made more money since his alleged personal injuries, is not disabled from the practice of medicine, has never been determined to be physically or occupationally disabled by a competent expert, and is so busy he could only be deposed on a Saturday.  They further claim that Plaintiff cannot prove that ASC and SCH breached their duty of care since he was not exposed to excessive radiation as a matter of law; rather Plaintiff's exposure to radiation at St. Luke's was

well below the radiation safety standards of Louisiana and the federal government.

>   **B.       Plaintiff's Response**

Plaintiff filed a Response in opposition to the Defendants' Motion.  (R. Doc. 49).  As a threshold matter, Plaintiff abandons nine out of ten of his breach of contract and breach of fiduciary duty claims because according to him, the time and expense of further litigating these claims outweighed the minimal amount of damages he could possibly recover.  These claims are: (1) failure to bill and collect for services performed; (2) failure to renegotiate to sell St. Luke's to a specific prospective purchaser; (3) failure to reduce management fee; (4) failure to attempt to renegotiate the lease; (5) contracting out anesthesia billing services; (6) making inter-company loans; (7) failure to make periodic financial disclosures; (8) selling the surgical center for too little money; and (9) failure to make a profit in managing St. Luke's.  Plaintiff then clarifies he will pursue the following claims and objects to summary judgment on them: (1) violations of the Louisiana Securities Act; (2) Defendants' failure to acquire a new x-ray machine which caused Plaintiff personal injuries and reduced his income by forcing him work at another medical facility; and (3) improper distribution of dividends to doctors who did not qualify to be members of St. Luke's according to the Operating Agreement.

At the outset of his Response, Plaintiff alleges that Symbion formed and controlled SCH and ASC as subsidiary, affiliated companies so as to allow Symbion to manage and control all operations and finances of St. Luke's.

Next, Plaintiff alleges that Ms. Charles, an employee of and controlled by Symbion, sold an unregistered security to Plaintiff, and thus Symbion is liable under the Louisiana Securities Act which renders liable those who sell unregistered securities.  Additionally, Plaintiff

claims that because Ms. Charles induced him to purchase his investment in St. Luke's through misrepresentations of fact and omissions of material fact, a second violation of the Security Act has occurred.

Plaintiff also addresses Defendants' prescription argument, arguing his claims under the Louisiana Securities Act are not prescribed because he had no reason to be put on notice of such claims more than two years before he brought his suit.

With regard to his personal injury claims, Plaintiff argues Defendants breached their duty of care by providing x-ray equipment which did not properly function and which they knew exposed Plaintiff to higher doses of radiation than necessary, accelerating his health problems and limiting the time he can continue in his occupation.  Plaintiff challenges Defendants' claim that he has no damages because his wages have increased, instead claiming he is entitled to a number of other damages, including but not limited to pain and suffering, inconvenience, mental distress, reimbursement for out-of-pocket expenses, future loss of income, future impairment of earning capacity, medical expenses, and permanent disability.  Additionally, Plaintiff claims Defendants rely upon the wrong standard of care for radiation exposure, claiming that under the Code of Federal Regulations, literature, and private (as opposed to public) industry standard of practice the applicable standard is As Low As Reasonably Achievable ("ALARA"), which has been violated by his radiation exposure at St. Luke's.

It also appears that Plaintiff supports his claim of improper distribution of dividends by alleging the defendants tortiously induced or interfered with the contracts at issue, rendering them liable under the law.

### C.     Defendants' Reply

The Defendants filed a Reply in further support of their Motion.  (R. Doc. 58). Defendants first reiterate their prescription argument under the Louisiana Securities Act, claiming Plaintiff filed his claims more than two years after his last purchase of securities.  They also challenge Plaintiff's claim that Ms. Charles made material misstatements in violation of the Act on the basis that such statements are either permissible statements of expected future events or opinions.  Additionally, Defendants note that Plaintiff was apprised of the fact the securities were unregistered and that the LLC has recorded net losses in the PPM and Subscription Agreements, the last of which he signed in July 31, 2007, rendering his LSA claims untimely.

The Defendants next address the Plaintiff's personal injury claims.  They refute that ALARA provides the appropriate standard of care for these claims.  They also argue that Plaintiff is not entitled to general damages because he failed to comply with his disclosure requirement for such under Rule 26(a)(1)(A)(iii).

Finally, Defendants address Plaintiff's remaining breach of contract and breach of fiduciary duty claims, arguing that any such claims should be dismissed on summary judgment because they pertain to the routine operations and managerial decisions committed by the Operating Agreement to the Managing Member of the facility, ASC, who is immune from such liability under both the Agreement and Delaware law.

## III.     LAW & ANALYSIS

### A.        Standard of Review

A district court can grant a motion for summary judgment only when the "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary

judgment, the district court "will review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986). The court must find "[a] factual dispute [to be] 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party [and a] fact [to be] 'material' if it might affect the outcome of the suit under the governing substantive law." *Beck v. Somerset Techs., Inc.*, 882 F.2d 993, 996 (5th Cir. 1989) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir. 1995) (citing Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986)). The mere argued existence of a factual dispute will not defeat an otherwise properly supported motion.  *See Anderson*, 477 U.S. at 248. "If the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. *Id.* at 249-50 (internal citations omitted).

### B.        Plaintiff's Abandoned Claims[1]

As noted above, Plaintiff has chosen to abandon all of his claims against the Defendants except the following: (1) violations of the Louisiana Securities Act; (2) breach of contract and breach of fiduciary duty claims for the Defendants' failure to purchase a new x-ray machines and issuance of improper dividends to physicians who failed to comply with the

---

[1]Although it was initially unclear to the Court which claims the Plaintiff chose to pursue and which he chose to abandon, the parties appeared to agree at oral argument the following is an accurate characterization of the status of Plaintiff's claims.

9

Operating Agreement; and (3) Plaintiff's personal injury claims arising from his exposure to allegedly excess radiation at St. Luke's.  *See* (R. Doc. 49).  With regard to all other abandoned claims filed by Plaintiff, the Court dismisses these claims on summary judgment.  *See Huckabay v. Moore,* 142 F.3d 233, 238 n.2 (5th Cir. 1998).  As to the three categories of claims which remain, the Court addresses these as follows.

### C.          Violations of the Louisiana Securities Act

Plaintiff seeks to pursue his claims against the Defendants for violations of the Louisiana Securities Act ("LSA").  Defendants claim summary judgment on these claims is warranted because these claims are prescribed.

As a threshold matter, the Court concludes that "Louisiana law controls...a federal court sitting in diversity will apply state prescription periods as substantive law."  *Richard v. Essex Ins. Co.*, 2009 WL 2762711, at *2 (E.D. La. Aug. 26, 2009)(citing *Guaranty Trust Co. v. York*, 326 U.S. 99, 110-12 (1945)).  Plaintiff's LSA claims arise from his allegations that Ms. Charles verbally misrepresented certain facts about his investment in SCH and he relied on these misrepresentations when he invested in SCH.[2]  Plaintiff raises these claims pursuant Louisiana Revised Statutes 51:712 and 51:714.  *See* (R. Doc. 49).  The LSA provides with regard to the

---

[2]Plaintiff also raises for the first time in his Response brief that Ms. Charles violated the LSA by selling him unregistered securities.  *See* (R. Doc. 49).  In the Fifth Circuit, "when a claim is raised for the first time in response to a summary judgment motion, the district court should construe that claim as a motion to amend the complaint under Federal Rule of Civil Procedure 15(a)."  *Riley v. Sch. Bd. Union Parish*, 379 Fed. App'x 335 (5th Cir. 2010).  At the hearing on the present Motion, Defendants indicated they opposed the Court's consideration of this claim.  Thus, the Court must determine whether an amendment is warranted.  Given that Plaintiff filed his Response brief on August 23, 2011, less than a month before trial, and Plaintiff provides no reason why he could not have raised this claim previously, the Court denies Plaintiff the opportunity to add this claim.  *See Rosenzweig v. Azurix Corp.*, 332 F.3d 8534, 864 (5th Cir. 2003).  Even if the Court permitted Plaintiff to add this claim it would be subject to the same prescriptive time period as his other LSA claim.  *See* La. Rev. Stat. 51:714(C).

prescriptive period for these claims, "[n]o person may sue under this Section more than two years from the date of the contract for sale or sale, if there is no contract for sale." La. Rev. Stat. § 51:714(C).

"[P]rescription statutes are strictly construed against prescription and in favor of the obligation sought to be extinguished; thus, of two possible constructions, that which favors maintaining, as opposed to barring, an action should be adopted." *Carter v. Haygood*, 2004-0646, p. 10; 892 So. 2d 1261, 1268 (La. 1/19/05). "'[T]he burden of proof generally rests on the party asserting prescription.'" *Snowizard, Inc. v. Robinson*, 2011 WL 2681197, *9 (E.D. La. July 8, 2011). Here, it is undisputed that Plaintiff executed the last of his Subscription Agreements to invest in SCH in July 2007. *See* (R. Docs. 1-1, 25, 48, 49-4). Thus, the prescription for Plaintiff's LSA claims would have run in July 2009, yet Plaintiff did not file his Petition until September 17, 2011, *see* (R. Doc. 1-1), leaving Plaintiff's LSA claims facially prescribed.

"When a complaint reveals on its face that the prescriptive period has lapsed, the plaintiff bears the burden of establishing a suspension or interruption of the prescriptive period." *Bartucci v. Jackson*, 245 Fed. App'x 254, 257 (5th Cir. 2007). Here, Plaintiff argues that prescription does not begin to run until the aggrieved party knows or reasonably should have known of a violation of the Act, and on this basis, his claims are not prescribed. The Court construes this argument as one under the doctrine of *contra non valentem*. Under Louisiana law, "[t]o soften the occasional harshness of prescriptive statutes, our courts have recognized a jurisprudential exception to prescription: *contra non valentem non currit praescriptio*, which means that prescription does not run against a person who could not bring his suit." *Carter*, 2004-0646 at p. 11; 892 So. 2d at 1268. *Contra non valentem* "is only to be applied in extreme

11

circumstances." *Marin v. Exxon Mobil Corp.*, 2009-2369, p.12, 13 (La. 10/19/10); 48 So. 3d 234, 245.

It appears Plaintiff commingles the following types of *contra non valentem* to support his argument: (1) that which suspends the running of prescription because Plaintiff's cause of action is not known or reasonably knowable by the Plaintiff, and (2) that which suspends running of prescription because the Defendants have acted to conceal facts from Plaintiff which would have put him on notice of its LSA claims. *Carter*, 2004-0646 at p. 11; 892 So. 2d at 1268. Notably, under both of these types of *contra non valentem*, if the Plaintiff knows or reasonably should have known of his cause of action, prescription is not suspended. *See Marin*, 2009-2369 at p.13; 48 So. 3d at 246 ("This principle will not exempt the plaintiff's claim from the running of prescription if his ignorance is attributable to his own wilfulness or neglect; that is, a plaintiff will be deemed to know what he could by reasonable diligence learned."); *Plaquemines Parish Comm'n Council v. Delta Dev. Co., Inc.*, 502 So. 2d 1034, 1057(La. 1987)("[P]rescription will begin to run only from the time the cause of action is discovered or might have been discovered by the exercise of reasonable diligence."). Indeed, the case largely relied upon by Plaintiff, *Jensen v. Snellings*, 636 F.Supp. 1305 (E.D. La. 1986), contains an extensive discussion of how prescription begins to run for claims under the LSA when the plaintiff knows of the LSA violation or is on notice of facts which, in the exercise of due diligence, would have led to actual knowledge of a violation.

Here, Plaintiff claims Ms. Charles made the following misrepresentations under the LSA: (1) St. Luke's would be managed by Symbion, (2) St. Luke's was "breaking even" from a profit and cash flow standpoint, (3) if Plaintiff brought his business to St. Luke's there would be

substantial profits for St. Luke's and substantial dividends for investors, (4) Plaintiff would be returned his initial $15,000 investment within one year, (5) Plaintiff would not be responsible for debts of the entities affiliated with St. Luke's and would have priority in payment of distributions, and (6) Plaintiff would not be exposed to injurious radiation and a new x-ray table would be purchased.  *See* (R. Doc. 25).

   In the final Subscription Agreement executed by Plaintiff on July 31, 2007, investing in SCH, the Plaintiff represented and warranted he "received and studied" the Operating Agreement and PPM, entering into the Subscription Agreement "in full knowledge and understanding of the terms and conditions [of the Operating Agreement and PPM] and of the risks described therein."  (R. Doc. 12-6)(Sealed).  He also warranted and represented that he "possess[ed] sufficient expertise to utilize the information furnished, evaluate the risks of investment in the LLC and make an informed decision."  *Id.*   Also that he "ha[d] been given the opportunity (I) to ask questions of, and receive answers from, the LLC concerning the terms and conditions of the investment, and (ii) to obtain any additional information which the LLC possesses or can reasonably obtain which is necessary to verify the accuracy of the information previously obtained."  *Id.*  He acknowledged "the speculative nature of an investment in an ambulatory surgery center and that his investment is subject to loss if the Center is unsuccessful."  *Id.*  Further, Plaintiff represented and warranted he did not receive "any representations or warranted from the LLC or its affiliates, agents or representatives and, in making his investment decision is relying solely on information provided to him at his request and his own personal knowledge, and investigations made by him."  *Id.*

   In the PPM, which as noted above, the Plaintiff represented and warranted he read

and understood the terms, conditions, and risks thereof, the corporate structure of SCH is laid

out, designating ASC as the Managing Member of the SCH, LLC.  (R. Doc. 12-5)(Sealed).  The

PPM, on its face and in bold letters states "[t]his investment involves a high degree of risk.  You

should purchase units only if you can afford to lose your investment," and contains an entire

section on "Risk Factors" associated with the investment in SCH.  *Id.*  It further states that

potential investors such as Plaintiff should request any information from the LLC he considers

necessary to make an informed investment and conduct his own examination of the LLC before

investing.  *Id.*  The PPM states "[w]e have not authorized anyone to provide you with

information that is different from the information in this document."  *Id.*  It further warns each

person contemplating investment to consult counsel or advisors.  *Id.*  In bold and caps, the PPM

cautions that any "Forward-Looking Statements" such as "the LLC's future business prospects,

demand for outpatient surgery in general, revenues, capital needs, interest costs and income...are

necessarily estimates that involve a number of risks and uncertainties that could cause actual

results to differ materially from those suggested by the 'Forward Looking Statements.'"  *Id.*  In

the section entitled "Outstanding Debt of the LLC," the PPM acknowledges that the LLC had

outstanding indebtedness of $263,741.20 as of March 31, 2007, the LLC had made no

distributions to its Members in 2007, and that as the payments towards this debt increases with

amortization, the LLC's cash available to distribute to its members will be negatively impacted.

*Id.*  In bold headings the PPM contains the following risk information: (1) The LLC is

experiencing operating losses; (2) The LLC may be unable to distribute cash to its Members; and

(3) The LLC has current debt and may incur additional debt in the future.  *Id.*  It also provides

that each Member in the LLC will share pro rata in the losses of the LLC.  *Id.*  With regard to

14

"Risk Factors" the PPM provides that "[t]he general economic, financial and regulatory risks of owning and operating an ambulatory surgery center are considered to be substantial and such risk could adversely affect the LLC and the Center.  An investment in the Units also involves a high degree of risk."  *Id*.

Finally, the Court notes that the Plaintiff is a well-educated and experienced physician.  The investment in question involves a medical facility.  It is not some exotic investment.  It is not unreasonable to expect that a physician would read the documents before signing them and if he has any questions, to consult with an attorney who can explain the documents to him.  He appears to have done neither.

Based upon the foregoing, the Court finds that Plaintiff fails to overcome his burden to demonstrate the applicability of *contra non valentem* to suspend the running of prescription on his LSA claims.  By executing the Subscription Agreement on July 31, 2007, Plaintiff was on notice or reasonably should have been on notice that the alleged misrepresentations made by Ms. Charles gave rise to claims under the LSA, thus prescription began to run from this time.  *See Jensen*, 636 F.Supp. at 1309 ("The limitations period is triggered by the discovery of facts which would cause a reasonable man to inquire whether he has suffered a legal wrong.  The plaintiff need only possess a low level of awareness; he need not fully learn of the alleged wrongdoing.").  The Subscription Agreement and incorporated documents contain information which Plaintiff represented and warranted he read, understood, and assumed the risk thereof, that directly contradicted the verbal statements of Ms. Charles.  Further these documents urged, if not required, Plaintiff to request information and seek advice of professionals before investing.  Of particular note is the provision in the PPM which expressly denied authorizing "anyone to

15

provide you with information that is different from the information in this document." (R. Doc.

12-5)(Sealed). This statement alone creates "'storm warnings'" sufficient to trigger the running

of prescription. *Jensen*, 636 F.Supp. at 1309. Thus, Plaintiff's LSA claims are prescribed.

### D.        Breach of Contract & Breach of Fiduciary Duty Claims

Plaintiff seeks to pursue breach of contract and breach of fiduciary duty claims

against the Defendants for failure to purchase a new x-ray machine and issuance of improper

dividends to physicians who failed to comply with the Operating Agreement. The Court will

address these claims as they pertain first to Symbion, then to SCH and ASC.

### 1.        Symbion

The Defendants seek summary judgment in favor of Symbion on the basis that

Symbion's only connection to Plaintiff is its indirect ownership of the corporation that is the

Managing Member (ASC) of the limited liability company (SCH) in which Plaintiff invested,

shielding Symbion from any liability. Defendants further argue that Plaintiff has put forth no

basis for piercing the corporate veil to impose liability upon Symbion for the claims against ASC

and SCH; there is no contractual or fiduciary relationship between Plaintiff and Symbion; there

are no direct claims against Symbion; and Symbion did not make any representations in

connection with the sale of units in SCH.

Plaintiff's Response contains a section entitled "Control" in which he alleges that

Symbion formed and controlled SCH and ASC as subsidiary and affiliated entities, allowing

Symbion to manage and control all operations and finances of St. Luke's. Also with regard to

Symbion, Plaintiff states in the final paragraph of his Response,

> Louisiana now recognizes that people (such as Symbion) who tortiously induce
> breaches of contract or who tortiously interfere with contractual relations may be

16

liable under Louisiana law.  In this case, Symbion induced SCH and ASC to not purchase a new x-ray machine, and to pay unqualified doctors dividends which were unwarranted, which would have increased the amount of distributions to [Plaintiff]. (R. Doc. 49).

In order to determine whether Symbion is shielded from liability for Plaintiff's claims against it, the Court must first determine Symbion's role in the corporate structure of St. Luke's. According to the PPM and attached documents,

> Surgery Center of Hammond, LLC, a Delaware limited liability company (the "LLC"), owns and operates an ambulatory surgery center located in Hammond, Louisiana (the "Center").

> ASC of Hammond, Inc. a Delaware corporation (the "Managing Member") is a wholly-owned subsidiary of ARC Financial Services Corporation, a Tennessee corporation, ("ARC Financial") which is a wholly-owned subsidiary of Symbion Ambulatory Resource Centers, Inc. a Tennessee corporation ("SARC"), which is a wholly-owned subsidiary of Symbion, Inc. a Delaware corporation ("Symbion").  (R. Doc. 12-5)(Sealed).

This corporate structure raises the question of whether a Member of an LLC (Plaintiff) can pierce the corporate veil to sue an indirect investor (Symbion) of the Managing Member of the LCC (ASC) for breach of contract and breach of fiduciary duty.

Unless Plaintiff demonstrates he can pierce the corporate veil to impose liability upon Symbion for the actions of SCH and ASC, he cannot pursue his breach of contract claim against Symbion because, as Defendants note, he is not in contractual privity with Symbion so there is no contract which could have been breached.  *See Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 887-88 (5th Cir. 2002); *Anderson v. Petro-Hunt Corp.*, 1997 WL 538016, at *1 (E.D. La. Aug. 27, 1997).  Nor can Plaintiff, absent piercing the corporate veil, pursue his breach of fiduciary duty claim against Symbion because there is no fiduciary relationship between Plaintiff and Symbion.  *See Risk Mgmt. Servs., LLC v. Moss,* 09-632 (La. App. 5 Cir.

4/13/10); 40 So. 3d 176, 182; *Haney v. Delta Petroleum Co., Inc.*, 2001-0636, p. 4 (La. App. 4

Cir. 3/6/02); 811 So. 2d 1200, 1202(citing *Holmes v. Harper*, 34,631 (La. App. 2 Cir. 5/9/01);

786 So. 2d 245); *see generally Scheffler v. Adams & Reese, LLP*, 2006-774, p.9 (La. 2/22/07);

950 So. 2d 614, 649.  Thus, the Court must first determine whether the corporate veil of

Symbion can be pierced.

   "It is a general principle of corporate law 'deeply ingrained in our economic and legal

systems that a parent corporation is not liable for the acts of its subsidiaries.'" *Blair v. Infineon*

*Techs. AG*, 720 F.Supp.2d 462, 469 (D.Del. 2010)(quoting *United States v. Bestfoods*, 524 U.S.

51, 61 (1998)).  Similarly, under Delaware law[3], a corporation's jural identity is not lightly

disregarded and "[a]bsent sufficient cause the separate legal existence of a corporation will not

be disturbed." *Gadsden v. Home Pres. Co., Inc*., 2004 WL 485468, at *4 (Del. Ch. Feb. 20,

2004).  However, in certain situations the corporate veil can be pierced to impose liability on a

parent corporation for the acts of its subsidiary.  "Since it is the exceptional instance where a

court will disregard the corporate form, the party who wishes the court to disregard that form

bears the burden of proving that there are substantial reasons for doing so."  *Mobil Oil Corp. v.*

*Linear Films, Inc*., 718 F.Supp. 260, 270-71 (D.Del. 1989).  "In order to succeed on such a

theory, "plaintiffs must essentially demonstrate that, in all aspects of the business, the

corporations actually functioned as a single entity and should be treated as such," or put another

way, that "'a corporate parent exercises complete domination and control over its subsidiary.'"

---

  [3]The Court applies the law of Delaware, as the state of incorporation for SCH, ASC, and
Symbion, to determine whether the corporate veil may be pierced to impose liability upon
Symbion.  *See Patin v. Thoroughbred Power Boats,* Inc., 294 F.3d 640, 646-47 (5th Cir. 2002).
Notably, both federal and Delaware law observe the same requirements for piercing the
corporate veil.  *See Blair v. Infineon Techs. AG*, 720 F.Supp.2d 462, 470 n.11 (D.Del. 2010);
*Mobil Oil Corp. v. Linear Films, Inc*., 718 F.Supp. 260, 268 (D. Del. 1989);

*Blair,* 720 F.Supp.2d at 470.  The elements for piercing the corporate veil are (1) "the traditional requirement that the corporation and its subsidiaries operated as a single economic entity," and (2) "an overall element of fraud, injustice, or unfairness."  *Id.*

Under the first element, there are a number of non-exhaustive factors to be considered, *see id.* at 470-71, none of which Plaintiff urges.  *See* (R. Doc. 1-1, 25, 49).  However, Plaintiff supports his "control" argument with his own affidavit and Symbion's SEC filings, see (R. Doc. 49-4), both of which the Court will consider.  Plaintiff's affidavit states that based upon the representations of Ms. Charles and the SEC filings, Symbion owned and operated St. Luke's.  *See* (R. Doc. 49-4).  However, as noted above, Ms. Charles' alleged representations are contrary to the PPM, Operating Agreement, and Management Agreement for St. Luke's, *see* (R. Docs. 12-5, 12-6)(Sealed), and even if substantiated, are unlikely to satisfy any of the factors considered by courts in determining the first element for piercing the corporate veil.  *See Blair,* 720 F.Supp.2d at 470.   Further, the SEC filings contain a general description of Symbion's business practices, without any reference to St. Luke's other than it has 73% ownership therein. (R. Doc. 49-4).  Mere ownership in a subsidiary is insufficient to pierce the parent's corporate veil.  *See Albert v. Alex Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *10 (Del.Ch. Aug. 26, 2005)("Ownership alone is not sufficient proof of domination or control."); *see also Mobil Oil Corp.,* 718 F.Supp. at 266-67.  Further, Delaware jurisprudence rejects the suggestion that a parent corporation's acknowledgment of ownership in a subsidiary in its required SEC filings subjects the parent to corporate veil piercing.  *See BASF Corp. v. POSM II Props. P'ship, LP*, 2009 WL 522721, at *10 (Del. Ch. Mar. 3, 2009).  The existence of a single economic entity as between Symbion and SCH is not supported by the evidence set forth by Plaintiff or any material

19

facts.

With regard to the second element required for piercing the corporate veil, overall fraud, injustice or unfairness, the jurisprudence is clear that a breach of contract or tort, such as that alleged by the Plaintiff, is insufficient.  *See Mobil Oil Corp*., 718 F.Supp. at 268; *Medi-Tec of Egypt Corp.,* 2004 WL 415251, at *7; *EBG Holdings, LLC v. VREDezicht's Gravenhage 109 B.V.*, 2008 WL 4057745, at *12 (Del. Ch. Sept. 2, 2008); *see also O'Leary v. Telecom Res. Serv., LLC*, 2011 WL 379300, at *7-8 (Del. Super. Ct. Jan. 14, 2011).  Thus, because there are no genuine issues of material fact which would permit piercing Symbion's corporate veil, Plaintiff's breach of contract and breach of fiduciary duty claims against Symbion are properly dismissed on summary judgment grounds.  *See MicroStrategy, Inc. v. Acacia Research Corp*., 2010 WL 5550455, at *11-12 (Del. Ch. Dec. 30, 2010).

However, before moving on to the claims against SCH and ASC, the Court notes that in his Response brief, Plaintiff appears to raise a claim against Symbion for tortious interference with business relations.  *See* (R. Doc. 49).  Even assuming this claim has been properly raised, it fails to survive summary judgment.  Under Louisiana law, a claim for tortious interference with business relations is viewed with disfavor, and

> Louisiana courts have limited this cause of action by imposing a malice element, which requires that the plaintiff show the defendant acted with actual malice. Although its meaning is not perfectly clear, the malice element seems to require a showing of spite or ill will, which is difficult (if not impossible) to prove in most commercial cases in which conduct is driven by the profit motive, not by bad feelings.  In fact, there appear to be no reported cases in which anyone actually has been held liable for the tort.  In order to sustain a claim for tortious interference with business relations, actual malice must be pleaded in the complaint.  *Bogues v. La. Energy Consultants, Inc*., 46,4343, p.6-7 (La. App. 2 Cir. 8/10/11); 2011 WL 3477033, at *6-7 (quoting *JCD Mktg. Co. v. Bass Hotels & Resorts, Inc*., 01-1096 (La. App. 4 Cir. 3/6/02); 812 So. 2d 834).

Plaintiff raises no allegations of actual malice in his complaints, *see* (R. Docs. 1-1, 25), thus there exists no impediment to prevent his claim from dismissal on summary judgment.

2.      *ASC & SCH*

Plaintiff also pursues breach of contract and breach of fiduciary duty claims against ASC and SCH for failure to purchase a new x-ray machine and issuance of improper dividends to physicians who failed to comply with the Operating Agreement.

Defendants argue that Plaintiff cannot prevail on his remaining breach of contract and fiduciary duty claims because: (1) Plaintiff is not a party to the Management Agreement, leaving him without standing to sue for any alleged breach of this Agreement, and (2) ASC and SCH cannot be held liable for breach of the Operating Agreement or fiduciary duty as a matter of law.

Plaintiff did not directly address Defendants' arguments in his Response brief or at oral argument, other than clarifying he is preserving his breach of contract and fiduciary duty claims. *See* (R. Doc. 49).

With regard to Plaintiff's claim that ASC and SCH breached the Management Agreement, because Plaintiff, in his individual capacity is not party to this agreement and only ASC and SCH are parties, he lacks standing to sue thereunder. *See* (R. Doc. 12-5)(Sealed); *Coco Oil & Gas, LLC v. Terry,* 2011 WL 2945765, at *6 (E.D. La. July 20, 2011); *Metro Riverboat Assocs., Inc. v. Bally's La., Inc*., 1999-0983, p.6 (La.App. 4 Cir. 1/24/01); 779 So. 2d 122, 125. Accordingly, Plaintiff's claim for breach of the Management Agreement does not survive summary judgment.

Plaintiff also alleges SCH and ASC breached the Operating Agreement, an agreement entered into by ASC and the members of its LLC, *see* (R. Doc. 12-5)(Sealed), including the

21

Plaintiff. "An operating agreement is contractual in nature; thus, it binds the members of the LLC as written and is interpreted pursuant to contract law." *Risk Mgmt. Servs., LLC v. Moss*, 09-632 (La. App. 5 Cir. 4/13/10); 40 So. 3d 176, 180. Under Delaware law[4], the obligations of the LLC and its members are defined by the terms of the Operating Agreement. *See Related Westpac, LLC v. JER Snowmass, LLC*, 2010 WL 2929708, at *6 (Del. Ch. July 23, 2010). Courts are "to give the maximum effect to the enforceability of limited liability company agreements." Del. Code tit. 6 § 18-1101(b); *Kahn v. Portnoy*, 2008 WL 5197164, at *1 (Del. Ch. Dec. 11, 2008)("The well settled policy of the Delaware Limited Liability Company Act is to give maximum effect to the principle of freedom of contract."). "Limited liability companies are primarily creatures of contract, and the parties have broad discretion to design the company as they see fit in an LLC agreement." *Kahn*, 2008 WL 5197164, at *1. "LLC agreements are contracts that are enforced according to their terms, and all fiduciary duties, except for the implied contractual covenant of good faith and fair dealing, can be waived in an LLC agreement." *Id*.

The Operating Agreement provides the Managing Member with express authority to "bring or defend, pay, collect, compromise, arbitrate, resort to legal action, or otherwise adjust claims or demands of or against the Company." (R. Doc. 12-5)(Sealed). Thus, ASC, as Managing Member of the SCH LLC, is the proper party to bring claims against SCH, not a physician member of the LLC such as Plaintiff who has waived his legal right to sue the LLC directly. *See generally R&R Capital, LLC v. Buck & Doe Run Valley Farms, LLC*, 2008 WL 3846318, at *5-8 (Del. Ch. Aug. 19, 2008)(recognizing an LLC agreement may properly waive

---

[4]Delaware law applies to the construction and governance of the Operating Agreement. *See* (R. Doc. 12-5)(Sealed).

the right of members to maintain claims so long as such waiver does not violate the LLC Act or public policy*; Del. Code tit.6 § 18-1001(implying the right to designate certain managers or members of an LLC with authority to bring claims against the LLC). Plaintiff could have brought non-waivable claims against SCH, such as violation of the implied contractual covenant of good faith and fair dealing, *see id.* at 5, 7, or he could have brought a derivative action against the LLC if ASC, as the Managing Member with authority to bring such suit failed to do so or was unlikely to do so. *See* Del. Code tit.6 § 18-1001. Instead, Plaintiff has brought his claims against SCH in his individual capacity, contrary to the waiver he agreed to and applicable law, thus he lacks standing to bring his breach of contract claims against SCH.

With regard to Plaintiff's claims against ASC, the Operating Agreement provides the following indemnity for ASC as the Managing Member,

> The Managing Member shall not be liable to the Company or to the Members for any losses, claims, damages or liabilities to which the Company or the Members may become subject insofar as any such losses, claims, damages or liabilities arise out of or are based upon any act, error or omission or alleged act, error or omission or any other matter, except for any such losses, claims, damages or liabilities resulting from the wilful misconduct or negligence of the Managing Member. *Id.*

This limitation of liability for the Managing Member, ASC, is consistent with Delaware law. *See* 6 Del.C. § 18-1101(c)-(e).

ASC, as the Managing Member, is granted by the Operating Agreement "full, exclusive and complete discretion in the financial management and control of the Company....full power and authority to execute all documents and instruments on behalf of the Company and take all other requisite actions on behalf of the Company." (R. Doc. 12-5)(Sealed). The Operating Agreement also bestows ASC with,

> [T]he sole right and power to perform or cause to be performed, at the Company's

23

expense and in its name, all things necessary to acquire, own and operate the Center...enter into a management agreement...perform any and all acts necessary or appropriate to the ownership and operation of the Center, including without limitation, commencing, defending and/or settling litigation regarding the Center or any aspect thereof...execute and deliver...bills of sale...bring or defend, pay, collect, compromise, arbitrate, resort to legal action, or otherwise adjust claims or demands of or against the Company. *Id.*

Plaintiff bases his breach of contract claims against ASC on the failure to purchase a new x-ray machine and the issuance of improper dividends. With regard to the x-ray machine, neither the Operating Agreement, nor any other agreement of the LLC provides that a new x-ray machine was to be purchased. The purchase of property on behalf of and for the benefit of the LLC is in the sole discretion of ASC as the Managing Member. *See* (R. Doc. 12-5)(Sealed). The only basis for Plaintiff's claim is the verbal representation of Ms. Charles which has no legal effect upon the actions of the Managing Member in making business decisions for the LLC. *See supra* pp. 19-21. Notably, Plaintiff testified he was informed that the purchase of a new x-ray machine did not occur because the LLC lacked sufficient "income flow" for the purchase. *See* (R. Doc. 58-1). Based upon the foregoing, the Court finds ASC did not breach the Operating Agreement by failing to procure a new x-ray machine for St. Luke's, as such omission does not arise to the level of "wilful[5] misconduct or negligence" as required to impose liability on ASC. *See* (R. Doc. 12-5)(Sealed).

With regard to Plaintiff's claim that ASC is liable for breach of the Operating Agreement for issuing improper dividends, the Court looks to the provisions of the Agreement to determine whether summary judgment is appropriate. Section 11.4 provides that in the case a

---

[5]Under Delaware jurisprudence, "wilful" in the context of an LLC operating agreement has been defined as "'voluntary and intentional, but not necessarily malicious'... 'awareness, either actual or constructive, of one's conduct and a realization of its probable consequences.'" *Kelly v. Blum*, 2010 WL 629850, at *12 (Del. Ch. Feb. 24, 2010).

physician member of the LLC no longer qualifies as such and does not cure this disqualification within a certain period of time, the disqualified physician member is "deemed to have offered all of the Units owned" to the Company which "shall have the right to purchase such."  (R. Doc. 12-5)(Sealed).  As evidenced by the plain language of the Operating Agreement, the LLC was not required to purchase the disqualified physician interests, but rather had the option to do so.  Thus, ASC did not breach the Operating Agreement by allegedly distributing dividends to non-qualifying doctors since to do so was within the "full exclusive an complete discretion" of ASC in its authority for "financial management and control of the Company....[and] full power and authority to execute all documents and instruments on behalf of the Company."  *Id*.

As noted, Plaintiff claims that SCH and ASC also breached their fiduciary duties by failing to purchase a new x-ray machine and issuing dividends to physicians who were not entitled to such dividends under the Operating Agreement.  Under Delaware law[6], because Plaintiff's breach of fiduciary duty claims arise directly from the LLC Operating Agreement, *see* (R. Doc. 12-5)(Sealed)(granting the Managing Member, ASC, the sole authority for financial management of the LLC, including executing sales on behalf of the LLC), these claims are precluded by the contractual claims on the same basis.  *See Solow v. Aspect Res., LLC*, 2004 WL 2694916, at *4 (Del. Ch. Oct. 19, 2004).  Indeed, "[b]ecause of the primacy of contract law over fiduciary law, if the duty sought to be enforced arises from the parties' contractual relationship, a contractual claim will preclude a fiduciary claim."  *Id*.  As noted above, these contractual claims are properly dismissed on summary judgment.

### E.     Personal Injury Claims

---

[6]Delaware law applies to Plaintiff's breach of fiduciary duty claims.  *See Torch Liquidating Trust v. Stockstill*, 561 F.3d 377, 385 n.7 (5th Cir. 2009).

Plaintiff pursues his claims against Defendants for personal injuries and related damages sustained as a result of the failure to acquire a new x-ray machine.

Defendants seek summary judgment on these claims, arguing (1) Plaintiff has not sustained his burden of proving he has suffered damages; (2) Plaintiff cannot prove Defendants breached their duty of care because he was never exposed to radiation over the federal and state safety levels; and (3) Plaintiff is prevented from recovering general damages because he failed to comply with the disclosure requirement under Rule 26(a)(1)(A)(iii).

In response, Plaintiff argues that the Defendants have breached their general duty to exercise reasonable care by knowingly providing him with an x-ray machine that was not properly functioning, exposing him to higher doses of radiation than necessary which accelerated certain of his health conditions and will limit his previous occupational life.  Additionally, Plaintiff accuses the Defendants of only arguing against his recovery of lost wages, when in fact he is entitled to recovery of both general and specific damages.  Finally, Plaintiff claims that because the x-ray machine exposed him to radiation greater than As Low As Reasonably Achievable ("ALARA"), Defendants have breached their duty of care.

Under Louisiana law, for a plaintiff to prevail on his personal injury claims, he bears the burden of proving the five-factor duty-risk analysis, that is (1) the party whose fault is at issue had a duty to conform his conduct to a specific standard, (2) this party's conduct failed to conform to the appropriate standard, (3) the party's conduct was a cause-in-fact of the injuries at issues, (4) the party's substandard conduct was a legal cause of the injuries at issue, and (5) there were actual damages.  *Jones v. Centerpoint Energy Entex*, 2011-0002 (La. App. 3 Cir. 5/25/11); 2011 WL 2020266, at *2 (citing *Toston v. Pardon*, 03-1747 (La. 4/23/04); 874 So. 2d 791).

"The plaintiff's failure to prove any of the elements of the duty-risk analysis results in a determination of no liability." *Id.* Elements (2) and (5) are at issue in the present Motion.

With regard to the breach of standard of care, the parties present competing expert opinions as to whether the x-ray machine's radiation levels were required to conform with the lower Louisiana and federal standards or the higher ALARA standard. "'[S]ummary judgment is often inappropriate where the evidence bearing on crucial issues of fact is in the form of expert opinion testimony.'" *See Watson v. Allstate Texas Lloyd's*, 224 Fed. App'x 335 (5th Cir. 2007)(quoting *Webster v. Offshore Food Serv., Inc.*, 434 F.2d 1191, 1193 (5th Cir. 1970)). Further, expert reports can be used to create genuine issues of material fact to defeat summary judgment. *See generally First United Fin. Corp. v. U.S. Fid. & Guar. Co.*, 96 F.3d 135, 139-41 (5th Cir. 1996). The Court finds this is the case here, rendering summary judgment on this issue inappropriate.

With regard to the actual damages element required for the Plaintiff's personal injury claims, the Court finds this issue survives summary judgment as well. The Court first addresses the Defendants' argument that Plaintiff's evidence of general damages should be stricken because he failed to comply with Rule 26 requirements for initial disclosures. Federal Rule of Civil Procedure 26(a)(1)(A)(iii) provides that "a party must...provide to the other parties...a computation of each category of damages claimed by the disclosing party." Rule 37(c)(1) provides that failure to do so results in "the party [] not [being] allowed to use that information...to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." "Rule 37 is flexible, and the Court has broad discretion to use as many and varied sanctions as necessary to balance out prejudice to the parties." *E.E.O.C.*

27

*v. IESI La. Corp.*, 720 F.Supp.2d 750, 753 (W.D. La. 2010).  "Extreme sanctions...are remedies of last resort."  *Id*.  Here, the Court finds that because Defendants have not alleged any harm from Plaintiff's untimely submission of general damages computations, such will not be excluded from trial.

Additionally, Defendants claim Plaintiff has not put forth evidence of damages he has suffered as a result of his alleged personal injuries because his income has increased since his alleged injuries, he is not and has not been declared disabled, and he remains busy with work.  However, as Plaintiff notes, in his complaints he seeks damages besides those challenged by Defendants.  *See* (R. Docs. 1-1, 25).  Under Louisiana law, a victim of a tort is entitled to "compensatory damages," which are "those damages 'designed to place the plaintiff in the position in which he would have been if the tort had not been committed.'" *McGee v. A C & S, Inc.*, 2005-1036 (La. 7/10/06); 933 So. 2d 770, 773-74.

> Compensatory damages are further divided into the broad categories of special damages and general damages.  Special damages are those which have a 'ready market value,' such that the amount of the damages theoretically may be determined with relative certainty, including medical expenses and lost wages, while general damages are inherently speculative and cannot be calculated with mathematical certainty.

> This court has previously defined general damages as 'those which may not be fixed with any degree of pecuniary exactitude but which, instead, involve mental or physical pain or suffering, inconvenience, the loss of gratification of intellectual or physical enjoyment, or other losses of life or life-style which cannot really be measured definitively in terms of money.'  *Id*. at 74.

Thus, because Defendants have not demonstrated there exist no genuine issues of material fact with regard to the personal injury damages alleged by Plaintiff, summary judgment is not appropriate on this issue.

## IV.        CONCLUSION

For the foregoing reasons, IT IS ORDERED that Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.


New Orleans, Louisiana this 9th day of September 2011.

_____

U.S. District Judge

29