## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **RALPH VINCENT KIDD, III** | * | **CIVIL ACTION** |
| | * | |
| **VERSUS** | * | **NO. 10-3361** |
| | * | |
| **SYMBION, INC.** | * | **SECTION "L"(3)** |

## FINDINGS OF FACT & CONCLUSIONS OF LAW

The present matter arises out of the Plaintiff, Ralph Vincent Kidd, III's investment in defendant Surgery Center of Hammond, LLC ("SCH"), the owner of an ambulatory surgery center at which Plaintiff worked during his investment named St. Luke's Surgery Center ("St. Luke's"), located in Hammond, Louisiana.  Plaintiff alleges mismanagement and misrepresentation against SCH, its managing member, co-defendant ASC of Hammond, Inc. ("ASC"), and owner of ASC, co-defendant Symbion, Inc. ("Symbion"), arising from this investment, as well as personal injuries sustained while working at St. Luke's. *See* (R. Docs. 1-1, 25).

SCH, ASC, and Symbion (collectively "Defendants") filed a Motion for Summary Judgment prior to trial.  (R. Doc. 38).  After hearing from the parties on oral argument and reviewing the briefs submitted by the parties, the Court dismissed all of Plaintiff's claims except those pertaining to his alleged personal injuries.  *See* (R. Doc. 66).

Plaintiff is a board-certified urologist with over 30-years of experience practicing medicine.  Between May 2007 and April 2010, Plaintiff performed most of his flouroscopic cystoscopy procedures at St. Luke's.  Plaintiff alleges that during the time he worked at St. Luke's he was exposed to injurious radiation and x-ray exposure, causing him to sustain personal

injuries.  *See* (R. Docs. 1-1, 25).  Plaintiff claims this exposure and his injuries were the result of the Defendants' deficient x-ray machine and their failure to fulfill their promise to purchase a new x-ray machine.  Defendants deny any liability for these alleged injuries and damages.  *See* (R. Docs. 12, 28).

This matter came on for trial without a jury on September 26-27, 2011.  *See* (R. Docs. 76, 78).  The Court has carefully considered the testimony of all of the witnesses and the exhibits entered into evidence during the trial, as well as the record.  Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court issues the following Findings of Fact and Conclusions of Law.  To the extent that any finding of fact may be construed as a conclusion of law, the Court hereby adopts it as such and to the extent that any conclusion of law constitutes a finding of fact, the Court adopts its as such.

## **FINDINGS OF FACT**

### **Identity of the Parties**

#### (1)

Plaintiff is a resident of and domiciled in the State of Louisiana.  Trial Tr. vol. 1 Sept. 26, 2011 (Plaintiff).

#### (2)

SCH is a Delaware limited liability company.  (R. Doc. 12-5)(Sealed).

#### (3)

ASC is a Delaware corporation and wholly-owned subsidiary of ARC Financial Services Corp., a Tennessee corporation, which is a wholly-owned subsidiary of Symbion Ambulatory Resource Center, Inc., a Tennessee corporation, which is wholly-owned subsidiary of Symbion, a

Delaware corporation.  (R. Doc. 12-5)(Sealed).

## St. Luke's

(4)

In 1996, Plaintiff and approximately 20 others entered into a joint venture with a company called A-Medicis to create an ambulatory surgery center that was later named St. Luke's.  Trial Tr. vol. 1 Sept. 26, 2011 (Plaintiff).

(5)

In approximately July 2001, St. Luke's was purchased from Dr. Kidd and his partners by SCH, which at that time was indirectly affiliated with Universal Health Services, Inc., in that ASC was the managing member of SCH and ACS was a subsidiary of Universal.  Trial Tr. vol. 1 Sept. 26, 2011 (Plaintiff); (R. Doc. 12-5).

(6)

In August 2004, a subsidiary of Symbion acquired the capital stock of ASC from Universal.  (R. Doc. 12-5)(Sealed).

(7)

Plaintiff returned to St. Luke's in May 2007, as a member of SCH, and conducted his practice at the facility until approximately April 2010.  Trial Tr. vol. 1 Sept. 26, 2011 (Plaintiff).

(8)

St. Luke's ceased operations in November 2010.  Trial Tr. vol. 1 Sept. 26, 2011 (Plaintiff); Trial Tr. vol. 2 Sept. 27, 2011 (Beurleine).

## Plaintiff's Practice & St. Luke's

(9)

Plaintiff is a board-certified urologist with over 30-years experience practicing medicine.  Trial Tr. vol. 1 Sept. 26, 2011 (Plaintiff).

(10)

During the course of his experience as a urologist, Plaintiff has performed flouroscopic cystoscopy procedures that have exposed him to radiation. Trial Tr. vol. 1 Sept. 26, 2011 (Plaintiff).

(11)

Between May 2007 and April 2010, Plaintiff performed his flouroscopic cystoscopy procedures at St. Luke's using a Siemens Polyphos x-ray machine.  Trial Tr. vol. 1 Sept. 26, 2011 (Plaintiff); Trial Tr. vol. 2 Sept. 27, 2011 (Greco); Joint Ex. 2 (Terry).

(12)

The Siemens Polyphos x-ray machine was originally purchased by St. Luke's when Plaintiff and his co-investors first developed the surgery center in 1996.  Trial Tr. vol. 1 Sept. 26, 2011 (Plaintiff).

(13)

Plaintiff used the Siemens Polyphos x-ray machine at St. Luke's for years before the Defendants became involved with St. Luke's.  Trial Tr. vol. 1 Sept. 26, 2011 (Plaintiff).

(14)

Plaintiff had medical staff privileges at three other facilities, North Oaks, St. Tammany Hospital, and Bogalusa Community Medical Center, at the same time he had privileges at St. Luke's; he could have conducted his cystoscopy procedures at any of these facilities.  Trial Tr. vol. 1 Sept. 26, 2011 (Plaintiff).

(15)

While conducting his cystoscopy procedures at St. Luke's, Plaintiff wore a radiation apron shield

and a thyroid shield, both of which reduced his radiation exposure.  Trial Tr. vol. 1 Sept. 26,

2011 (Plaintiff & Dr. West).

(16)

Plaintiff also always wore a radiation-detection device, known as a TDL, on his

collarbone/shoulder area, outside of his apron, which provided readings on his radiation

exposure while conducting his procedures.  Trial Tr. vol. 1 Sept. 26, 2011 (Plaintiff).

(17)

Plaintiff used the same surgical techniques at all facilities and during his 30 years of practice.

Trial Tr. vol. 1 Sept. 26, 2011 (Plaintiff).

(18)

Plaintiff exercised the same protective measures at the other facilities as he did at St. Luke's.

Trial Tr. vol. 1 Sept. 26, 2011 (Plaintiff).

(19)

In April 2010, Plaintiff stopped performing procedures at St. Luke's, instead electing to perform

procedures at the other facilities where he had surgical privileges.  Trial Tr. vol. 1 Sept. 26, 2011

(Plaintiff).

(20)

Plaintiff stopped performing his procedures at St. Luke's because he felt the x-ray machine was

not performing well enough to allow Plaintiff to provide quality work to his patients;

specifically, it was falling apart, requiring servicing and cancellation and/or delay of patient

appointments.  Trial Tr. vol. 1 Sept. 26, 2011 (Plaintiff); Trial Tr. vol. 2 Sept. 27, 2011 (Greco &

Knight).

(21)

Despite Plaintiff's complaints regarding the St. Luke's x-ray machine, Plaintiff still was able to

perform approximately 100 procedures per month using the x-ray machine, a relatively high

volume of procedures.  Trial Tr. vol. 2 Sept. 27, 2011 (Greco & Knight); Joint Ex. 5.

(22)

When the x-ray machine would break-down, St. Luke's would hire repairmen to fix it.  Trial Tr.

vol. 2 Sept. 27, 2011 (Greco).

**Plaintiff's Radiation Exposure**

(23)

Monthly, Atomic Entergy Industrial Laboratories ("AEIL") issued radiation reports on the

subject x-ray machine and sent these reports to St. Luke's.  Trial Tr. vol. 2 Sept. 27, 2011

(Knight); Defs.' Trial Ex. D1.

(24)

The AEIL reports were based upon the TDL badge readings.  Joint Ex. 1.

(25)

The highest radiation exposure to which Plaintiff was exposed to while working at St. Luke's,

based upon his AEIL reports, is as follows: in 2007 2.6 rem; in 2008 4.045 rem; and in 2009

4.735 rem.  Trial Tr. vol. 1 Sept. 26, 2011 (Dr. West); Defs.' Ex. D4(B)(Dr. Frazier); Joint Ex. 1.

(26)

Kelley Knight, the x-ray technician at St. Luke's, was informed by AEIL that Plaintiff's radiation

exposure was high at some point during 2009; Ms. Knight reported this information to Plaintiff

in October or November 2010.  Trial Tr. vol. 1 Sept. 26, 2011 (Plaintiff); Trial Tr. vol. 2 Sept.

27, 2011 (Knight); Defs.' Ex. 1D.

(27)

Plaintiff was exposed to higher levels of radiation at St. Luke's than at the other facilities even

though he was using the same technique and conducting the same procedures at all facilities.

Trial Tr. vol. 1 Sept. 26, 2011 (Plaintiff).

(28)

During his time at St. Luke's, Plaintiff was exposed to radiation at levels higher within the range

typical for medical personal and physicians using fluoroscopes.  Trial Tr. vol. 1 Sept. 26, 2011

(Dr. West); Defs.' Ex. D4(B)(Frazier).

(29)

Based upon the St. Luke's radiation reports from Plaintiff's TDL badge, Plaintiff's radiation

exposure at St. Luke's never exceeded federal or state levels.  Trial Tr. vol. 1 Sept. 26, 2011 (Dr.

West); Defs.' Ex. D4(B)(Frazier); Joint Ex. 1 (AEIL Reports).

(30)

Plaintiff's radiation exposure to his whole body while at St. Luke's never exceeded state or

federal levels whether or not the dose was multiplied by 0.3 as required by Louisiana statutory

law. Trial Tr. vol. 1 Sept. 26, 2011 (Dr. West); Defs.' Ex. D4(B)(Frazier).

(31)

Because Plaintiff always wore a lead apron when conducting his procedures at St. Luke's and

while doing so wore his TDL badge on the outside of his apron, the radiation to his whole body

was lower than that recorded by the TDL badge. Trial Tr. vol. 1 Sept. 26, 2011 (Dr. West); Defs.'

Ex 4D(B)(Frazier).

(32)

St. Luke's did not, but could have given Plaintiff a ring badge to better monitor the radiation

levels to his hands. Trial Tr. vol. 1 Sept. 26, 2011 (Dr. West).

(33)

Because Plaintiff was not given a ring badge and his method for conducting the cystoscopy

procedure required him to place his hands and eyes near the radiation source, the TDL badge on

Plaintiff's shoulder/collarbone-area did not provide accurate readings for radiation levels at

Plaintiff's hands and eyes, levels which would be higher because of the closer proximity to the

radiation source.  Trial Tr. vol. 1 Sept. 26, 2011 (Dr. West).

(34)

No evidence was presented which was able to accurately calculate Plaintiff's radiation exposure

to his eyes and hands beyond what was provided by the AEIL reports and the testimony that the

exposure would be generally higher because of the shorter distance from the radiation source.

Trial Tr. vol. 1 Sept. 26, 2011 (Dr. West).

(35)

St. Luke's could have developed, documented, and implemented a better radiation protection

program.  Trial Tr. vol. 1 Sept. 26, 2011 (Dr. West); Trial Tr. vol. 2 Sept. 27, 2011 (Greco).

(36)

St. Luke's could have taken steps to further reduce Plaintiff's radiation exposure.  Trial Tr. vol. 1

Sept. 26, 2011 (Dr. West).

(37)

The monthly AEIL radiation reports were posted on the wall behind Ms. Knight's desk.  Trial Tr.

vol. 2 Sept. 27, 2011 (Knight)

(38)

St. Luke's did not provide the Plaintiff with warnings, policies, or procedures regarding radiation

exposure safety.  Trial Tr. vol. 1 Sept. 26, 2011 (Plaintiff); Trial Tr. vol. 2 Sept. 27, 2011 (Greco

& Knight).

(39)

The subject x-ray machine has radiation warnings on its door.  Joint Ex. 2 (Terry).

(40)

Ms. Knight conducted a radiation safety training and issued a test thereon in approximately July

2008.  Trial Tr. vol. 2 Sept. 27, 2011 (Knight).

(41)

Plaintiff was never trained on how to use the x-ray machine at St. Luke's; nor was he given

training at any of the facilities where he had privileges at that time.  Trial Tr. vol. 1 Sept. 26,

2011 (Plaintiff); Trial Tr. vol. 2 Sept. 27, 2011 (Greco & Knight).

(42)

At least one physician other than Plaintiff used the subject x-ray machine at St. Luke's.  Trial Tr.

vol. 2 Sept. 27, 2011 (Knight).

(43)

At least annually, the subject x-ray machine would be evaluated and a report submitted which

was placed in a binder at St. Luke's.  Trial Tr. vol. 2 Sept. 27, 2011 (Knight).

(44)

On August 18, 2009, Dr. James A. Terry determined that the St. Luke's x-ray machine was generally satisfactory and in compliance with applicable standards and law.  Joint Ex. 2 (Terry); Trial Tr. vol. 2 Sept. 27, 2011 (Knight).

(45)

Because the subject x-ray machine had image-quality problems, higher doses of radiation were needed to obtain clearer images from it.  Trial Tr. vol. 1 Sept. 26, 2011 (Dr. West); Trial Tr. vol. 2 Sept. 27, 2011 (Knight).

**Plaintiff's Medical Complaints**

(46)

In the winter of 2010, Plaintiff testified that he began experiencing problems with his eyes, particularly tearing, blurring, and stinging.  Trial Tr. vol. 1 Sept. 26, 2011 (Plaintiff).

(47)

On January 25, 2011, Plaintiff had an appointment with Dr. Richard Bessent, an ophthalmologist, during which Dr. Bessent diagnosed Plaintiff with dry eye syndrome, posterior blepharitis (meibomian gland dysfunction), a minor degree of nuclear sclerotic cataracts, and possible glaucoma.  Trial Tr. vol. 1 Sept. 26, 2011 (Plaintiff & Dr. Bessent); Trial Tr. vol. 1 Sept. 27, 2011 (Dr. Hendricks); Joint Ex. 3.

(48)

Plaintiff testified that he first suspected his eye problems were caused by his exposure to radiation during March 2011 after hearing news reports about the radiation problems following the tsunami in Japan.  Trial Tr. vol. 1 Sept. 26, 2011 (Plaintiff).

(49)

Sometime around March or April 2011, Plaintiff requested and obtained the AEIL reports on his

radiation exposure during 2007-2010 at St. Luke's and showed these reports to Dr. Bessent at an

appointment on April 12, 2011.  Trial Tr. vol. 1 Sept. 26, 2011 (Plaintiff); Joint Ex. 3.

(50)

At the April 12, 2011 appointment, Dr. Bessent diagnosed Plaintiff with the same conditions as

in January 2011.  Trial Tr. vol. 1 Sept. 26, 2011 (Dr. Bessent).

(51)

Plaintiff continues to complain of excessive tearing in his eyes; this tearing requires that nurses

dry his eyes every 30-minutes while he performs procedures.  Trial Tr. vol. 1 Sept. 26, 2011

(Plaintiff).

(52)

Plaintiff also complains of discomfort in his hands, particularly his index finger, bumps on his

legs, a lesion on his left hand, and a problem with his right index finger.  Trial Tr. vol. 1 Sept.

26, 2011 (Plaintiff).

(53)

Plaintiff claims he can no longer perform certain procedures because of his problems with his

eyes and hands; however, Plaintiff continues to engage in his practice, earning more each year

than the last.  Trial Tr. vol. 1 Sept. 26, 2011 (Plaintiff); Joint Exs. 9-11.

(54)

Plaintiff testified that he has suffered emotionally and sexually due to the effects that the

problems with his hands and eyes are having on his practice.  Trial Tr. vol. 1 Sept. 26, 2011

(Plaintiff).

(55)

Plaintiff did not seek any medical care, diagnosis or treatment for any of his eye problems until

after he filed the present suit. Trial Tr. vol. 1 Sept. 26, 2011 (Plaintiff); Defs.' Ex. 1D.

(56)

Plaintiff has not sought treatment or received diagnoses for any of his non-eye-related medical

ailments, but says that he plans to do so in the future.  Trial Tr. vol. 1 Sept. 26, 2011 (Plaintiff);

Defs.' Ex. 1D.

(57)

Physicians performing procedures using flouroscopic x-ray machines sustain radiation exposure;

this exposure is approximately proportional to the number of procedures performed.  Defs.' Ex.

D4(B)(Dr. Frazier).

(58)

Natural radiation and radioactivity in the environment provide the major source of human

radiation exposure.  Defs.' Ex. D4(B)(Dr. Frazier).

(59)

Any exposure to radiation increases one's chances of contracting fatal cancer, though as

recognized by statutes and radiation protection advisory organizations, there are permissible

levels of occupational radiation exposure.  Trial Tr. vol. 1 Sept. 26, 2011 (Dr. West); Defs.' Ex.

D4(B)(Dr. Frazier).

(60)

The radiation to which Plaintiff was exposed during his time at St. Luke's from 2007 to 2010

only comprises a small percentage of his total radiation exposure during his lifetime.  Defs.' Ex.

4D(B)(Frazier).

(61)

The radiation to which Plaintiff was exposed at St. Luke's, at most, increased Plaintiff's chance

of contracting a fatal cancer by 0.4%.  Trial Tr. vol. 1 Sept. 26, 2011 (Dr. West); Trial Tr. vol. 1

Sept. 27, 2011 (Dr. Hoel) .

(62)

Posterior blepharitis (meibomian gland malfunction) is not associated with exposure to radiation.

Trial Tr. vol. II Sept. 27, 2011(Dr. Hendricks)

(63)

There is no association between glaucoma and exposure to radiation.  Trial Tr. vol. II Sept. 27,

2011(Dr. Hendricks)

(64)

The single largest cause of dry-eye syndrome is blepharitis.  Trial Tr. vol. II Sept. 27, 2011(Dr.

Hendricks)

(65)

Dry-eye may also be caused by a variety of environmental factors such as staring at computer

screens, air-conditioning, allergies, smoking, ceiling fans, and air pollution.  Trial Tr. vol. II

Sept. 27, 2011(Dr. Hendricks); Trial Tr. vol. 1 Sept. 27, 2011 (Dr. Hoel).

(66)

Plaintiff's tearing issues are unrelated to radiation exposure.  Trial Tr. vol. II Sept. 27, 2011(Dr.

Hendricks)

(67)

Plaintiff's Shirmer's Test results, showing that one is eye normal and the other asymmetrical, are

inconsistent with radiation being the cause of Plaintiff's eye conditions. Trial Tr. vol. II Sept. 27,

2011(Dr. Hendricks)

(68)

There are some studies which suggest that radiation exposure has some connection to dry-eye;

however, there is insufficient research to demonstrate a causal relationship between exposure to

radiation and dry-eye.  Trial Tr. vol. II Sept. 27, 2011(Dr. Hendricks); Trial Tr. vol. 1 Sept. 27,

2011 (Dr. Hoel).

(69)

Plaintiff's eye conditions are normal for someone his age, 66-years old.  Trial Tr. vol. II Sept. 27,

2011(Dr. Hendricks)

(70)

Age is one factor that has been linked to dry-eye syndrome.  Trial Tr. vol. 1 Sept. 26, 2011 (Dr.

Bessent); Trial Tr. vol. II Sept. 27, 2011(Dr. Hendricks).

(71)

There is no evidence of a link between radiation exposure and nuclear sclerotic cataracts, the

type of cataracts from which Plaintiff suffers.  Trial Tr. vol. 1 Sept. 26, 2011 (Dr. Bessent); Trial

Tr. vol. II Sept. 27, 2011(Dr. Hendricks); Trial Tr. vol. 1 Sept. 27, 2011 (Dr. Hoel).

(72)

Aging is the only known cause of sclerotic cataracts.  Trial Tr. vol. II Sept. 27, 2011(Dr.

Hendricks); Trial Tr. vol. 1 Sept. 26, 2011 (Dr. Bessent).

(73)

No physician has attributed Plaintiff's dry-eye syndrome, glaucoma, or cataracts specifically to his exposure to radiation while working at St. Luke's from 2007 to 2010.  Trial Tr. vol. 1 Sept. 26, 2011 (Dr. Bessent); Trial Tr. vol. II Sept. 27, 2011(Dr. Hendricks); Trial Tr. vol. 1 Sept. 27, 2011 (Dr. Hoel); Defs.' Ex. 1D.

(74)

No physician has opined that Plaintiff's radiation exposure at St. Luke's exacerbated any pre-existing medical conditions.  Trial Tr. vol. 1 Sept. 26, 2011 (Dr. Bessent); Trial Tr. vol. II Sept. 27, 2011(Dr. Hendricks); Trial Tr. vol. 1 Sept. 27, 2011 (Dr. Hoel); Defs.' Ex. 1D.

(75)

It is possible Plaintiff may develop other types of cataracts in the future, but it is speculative that these cataracts would be caused by his exposure to radiation at St. Luke's from 2007 to 2010. Trial Tr. vol. II Sept. 27, 2011(Dr. Hendricks)


## CONCLUSIONS OF LAW

### Threshold Legal Issues

(76)

Subject matter jurisdiction is vested in this Court pursuant to 28 U.S.C. § 1332, as there exists complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00.

(77)

Personal jurisdiction exists over the parties.  *See* Fed. R. Civ. P. 12(h); *see generally J. McIntyre*

*Mach., Ltd. v. Nicastro*, 131 S.Ct. 2780, 2787-88 (2011).

(78)

Venue is proper in this district as the events giving rise to the litigation occurred within the

Eastern District of Louisiana.  28 U.S.C. § 1391.

(79)

Louisiana's substantive law governs the present dispute.  *See Coury v. Moss*, 529 F.3d 579, 584

(5th Cir. 2008).

## Liability

(80)

Under Louisiana law, in order to determine whether liability exists for the Defendants, the

Plaintiff must prove all of the following elements under the duty-risk analysis: (1) the conduct in

question was the cause-in-fact of the resulting harm; (2) the defendant owed a duty of care to

plaintiff; (3) the requisite duty was breached by the defendant; and (4) the risk of harm was

within the scope of protection afforded by the duty breached.  *Mundy v. Dep't of Health &*

*Human Res.*, 620 So. 2d 811, 813 (La. 1993).

### Cause-in-Fact

(81)

The cause-in-fact element is a question of fact.  *Rando v. Anco Insulations, Inc*., 2008-1163 (La.

5/22/09); 16 So. 3d 1065, 1087.

(82)

Under Louisiana law, "[i]n a personal injury action, the plaintiff bears the burden of proving a

causal relationship between the injury sustained and the accident at issue."  *Davis v. Foremost*

*Dairies*, 45,835, p.7 (La. App. 2 Cir. 2/16/11); 58 So. 3d 977, 984.

(83)

It is well established that "[t]he plaintiff must prove causation by a preponderance of the evidence." *Id.* (internal citations omitted); *Arabie v. Citgo Petroleum Corp.*, 2010-244, p.6 (La. App. 3 Cir. 10/27/10); 49 So. 2d 529, 535.

(84)

"The test for determining the causal relationship between an accident and subsequent injury is whether the plaintiff proved through medical or lay testimony that it is more probable than not that the subsequent injuries were caused by the accident." *Cannet v. Franklynn Pest Control Co., Inc.*, 08-56 (La. App. 5 Cir. 4/29/08); 985 So. 2d 270, 276.

(85)

A defendant takes its victim as it finds him and is responsible for all natural and probable consequences of its negligence. *Lasha v. Olin Corp.*, 625 So. 2d 1002, 1006 (La. 1993).

(86)

If a defendant's conduct aggravates a pre-existing injury or condition, the defendant must compensate the victim for the full extent of the aggravation. *Id.*

(87)

Plaintiff has not demonstrated by a preponderance of the evidence that his exposure to radiation while conducting his procedures at St. Luke's from 2007 to 2010 is the cause-in-fact of his medical conditions and ailments.

(88)

There exists no or insufficient evidence that radiation exposure of the type and degree to which

Plaintiff was exposed at St. Luke's from 2007 to 2010 caused Plaintiff's eye problems, his hand, finger, and leg ailments, or his emotional and sexual issues.

(89)

The de minimis possibility of Plaintiff developing cancer or a different form of cataracts in the future as a result of his exposure to radiation while working at St. Luke's from 2007 to 2010 is too remote to establish cause-in-fact.

**Duty: Breach & Scope**

(90)

"In general, the owner or operator of a facility has the duty of exercising reasonable care for the safety of persons on his premises and the duty of not exposing such persons to unreasonable risks of injury or harm." *Mundy*, 620 So. 2d at 813.

(91)

St. Luke's, as a facility which owns and operates x-ray equipment, has an obligation to its employees using that equipment to maintain the radiation doses below the state and federal statutory limits. *See* La. Admin. Code tit. 33, pt. XV, §§ 406, 410; Trial Tr. vol. 1 Sept. 26, 2009 (Dr. West).

(92)

St. Luke's is also required to maintain radiation doses to its employees to a level as low as reasonable achievable ("ALARA"). *See* La. Admin. Code tit. 33, pt. XV, §§ 406, 410; Trial Tr. vol. 1 Sept. 26, 2009 (Dr. West).

(93)

The Louisiana state and federal statutory radiation dose limits ("statutory dose limits") are the

same.  *See* La. Admin. Code tit. 33, pt. XV, § 410; 10 C.F.R. § 20.1201; Trial Tr. vol. 1 Sept. 26,

2009 (Dr. West).

(94)

The statutory whole body dose limit is 5 rem per year.  La. Admin. Code tit. 33, pt. XV, § 410;

Trial Tr. vol. 1 Sept. 26, 2011 (Dr. West).

(95)

The statutory dose limit for extremities and skin is 50 rem per year.  La. Admin. Code tit. 33, pt.

XV, § 410; Trial Tr. vol. 1 Sept. 26, 2011 (Dr. West).

(96)

The statutory dose limit for the lens of the eye is 15 rem per year.  La. Admin. Code tit. 33, pt.

XV, § 410; Trial Tr. vol. 1 Sept. 26, 2011 (Dr. West).

(97)

Louisiana statutory law requires that individuals working with medical flouroscopic equipment

be provided with individual radiation monitoring devices which are to be located at the neck,

outside of the protective apron.  La. Admin. Code tit. 33, pt. XV, § 431.

(98)

If a protective apron is worn while working with medical flouroscopic equipment and monitoring

is conducted by wearing a single monitoring device located at the neck outside the protective

apron, the effective whole body dose equivalent for external radiation shall be determined by

reported dose or, if the reported dose exceeds 25% of the limit specified under law, the reported

dose multiplied by 0.3 shall be the effective whole body dose.  La. Admin. Code tit. 33, pt. XV,

§ 410.

(99)

Under Louisiana law, ALARA requires an employer or facility, to the extent practicable, to use procedures and engineering controls based upon sound radiation protection principles to achieve occupational doses of radiation that are low as reasonably achievable, taking into account all factors.  La. Admin. Code tit. 33, pt. XV, § 406; Trial Tr. vol. 1 Sept. 26, 2011 (Dr. West).

(100)

Because the Louisiana ALARA requirement is similar, if not identical, to the federal requirement, the Court finds, pursuant to jurisprudence selecting the federal dosage level as the standard of care, that the Louisiana state dosage level is the standard of care in the present matter, as opposed to ALARA.  *See* 10 C.F.R. § 20.1101; *compare with* La. Admin. Code tit. 33, pt. XV, § 406; *see also Finestone v. Fla. Power & Light Co.*, 272 Fed. App'x 761, 765-66 (11th Cir. 2008); *Finestone v. Fla. Power & Light Co.*, 319 F.Supp.2d 1347, 1349-50 (S.D. Fla. 2004); *Corcoran v. N.Y. Power Authority*, 935 F.Supp. 376, 386-87 (S.D.N.Y. 1996); *McLandrich v. S. Cal. Edison Co.*, 942 F.Supp. 457. 467 (S.D. Cal. 1996); *Bohrmann v. Maine Tankee Atomic Power Co.*, 926 F.Supp. 211, 219-20 (D. Me. 1996); *contra McCafferty v. Centerior Serv. Co.*, 983 F.Supp. 715, 718 (N.D. Ohio 1997).

(101)

ALARA standards may be equal to statutory standards.  Trial Tr. vol. 1 Sept. 26, 2011 (Dr. West).

(102)

Louisiana statutory law requires that an employer or facility develop, document, and implement a radiation protection program sufficient to ensure compliance with radiation laws.  La. Admin.

-20-

Code tit. 33, pt. XV, § 406.

(103)

Louisiana statutory law requires that, at least on an annual basis, an employer or facility maintain

records of radiation exposure sustained by employees for whom monitoring is required.  La.

Admin. Code tit. 33, pt. XV, § 476.

(104)

Louisiana statutory law requires that, at least on an annual basis, an employer or facility furnish

to its employees written records of their radiation exposure.  La. Admin. Code tit. 33, pt. XV, §

1013.

(105)

Defendants had a duty to exercise measures to prevent Plaintiff from excessive radiation

exposure while working at St. Luke's; they did not breach this duty since Plaintiff was never

exposed to radiation levels beyond the statutory limits, Plaintiff was given a TDL to wear at his

neck and a protective apron, there was a minimal radiation protection program in place, and

radiation exposure records were maintained monthly.

(106)

While Defendants could have implemented better procedures and exercised greater caution to

further reduce Plaintiff's radiation exposure at St. Luke's, the failure to do so does not constitute

a breach of their duty to Plaintiff.

**Damages**

(107)

Because the Court finds the Plaintiff has failed to demonstrate the liability of the Defendants by

a preponderance of the evidence, his personal injury claims cannot be sustained and he is not entitled to damages.

New Orleans, Louisiana this 9th day of December 2011.

_____
U.S. District Judge